Heather Venerus v. Avis Budget Car Rental. And I believe Mr. Lynch, you're going first? Yes, Your Honor, and good morning. And may it please the Court, Chris Lynch for the Plaintiff Appellant, Heather Venerus. With me is my co-counsel, Ed Norman. Your Honor, to get right to the heart of this, this is a straightforward consumer fraud case based on the defendant's failure to provide a third-party automobile liability insurance policy to individuals who were promised the policy, who paid for the policy, and were not given the policy. Those individuals were Heather Venerus and the putative class members who are foreign tourists who came to the state of Florida and rented the defendant's vehicles in the state. As a result of Ms. Venerus' efforts in this case, that scheme or plan has been unearthed. The defendants have now admitted that they do not provide the coverage. The coverage does not exist. Ms. Venerus recovered on her breach of contract case below. She obtained a judgment in her favor. It was a cross appeal. That cross appeal has been dropped. I have a question. Assuming there was a class on the contract claim, what else would you get with the DUPPA claim on that? Yes, Your Honor. What more would you get than you would get on the contract? These are consistent remedies you can plead until there's one satisfaction. We get attorney's fees on the FIDUPTA case, which is a big interest. The damages are the same. In this case, the judge awarded the $1,244 per day. That's the benefit of the bargain for FIDUPTA. I think the FIDUPTA statute even says that if you have a cumulative remedy, it doesn't do away with the FIDUPTA payment. This is a classic FIDUPTA case, even though we have a breach of contract. Also, the defendants— Can I ask another question about that? Yes. I understand your argument about the form contracts, but on a FIDUPTA claim, is there some kind of reliance you have to show that would be individual and not as readily addressable as a class claim? I think you can prove that on a class-wide basis, and there was certainly a reliance. It's more of an objective than a subjective standard. You don't have to look into the minds of each putative class member. This court did that in the Cariola v. General Motors case. They upheld class certification on a similar FIDUPTA-type case. They virtually admitted our claim on FIDUPTA. It's summary judgment material. The way this business practice was, they knew that they had to offer this insurance. They've admitted that we could not get this business unless we offered this insurance to those foreign renters. Why is that? They want—the foreigners, unlike the domestic renters, for some reason, they're very afraid of getting in an accident, and they want the insurance. They want excess insurance? Yes, this is excess insurance. The insurance for the financial responsibility is required as a matter of statute, but this is above and beyond that. They know that they can't get this business— But it doesn't cover uninsured motorists. Unless there's a proper rejection, it would not cover uninsured motorist coverage, but it should be offered. And a lot of them do. Various companies sell this excess coverage, and a lot of them do provide uninsured motorist coverage. That was our original claim. We thought— You thought it was covered. We thought that there was ACE coverage because there was a perjurious affidavit, and we've attached a bunch of them in this case. They hid this scheme from the public. If they had actually procured it from ACE as opposed to self-providing it, according to their theory of the case, and the district court's already ruled on that, they should have provided it from ACE, and there was a breach of contract. Going to Judge Black's question, the ACE insurance would not have included— what you bargained for did not include UM insurance. It did not on its face, but we— Right, right. Yes. Now, I know you have Florida law issues about what Florida law requires about all that. Yes. But that's not where we are right here. What they were required to do under Florida law that they didn't do. What we're here on first is if you had gotten the ACE insurance and the SLI, it wouldn't have had UM. We think they should have had UM, but it would not have on the face of that policy. But we're beyond that. We dropped that claim, and we're— Right, okay. We, as a matter of law, has been damaged. If you promise something and you don't get it in a contract, as the GMA— And do you challenge the $12 or $14 as what the damage was? You haven't challenged that. No, you're right. You say that's a fair estimation of what the part of the premium or the part of the payment was. By law, that's the rate they have to charge. It's on the actual insurance policy, the ACE policy, and they have— that's why it makes this case so suitable to class certification. We know the policy that's on the premium for each of those years. The trial judge made a factual finding— How do we know what's the premium on the ACE policy? I'm just curious. They agreed to that. Okay, and how much— They stipulated to that $12.44 a day. Okay. $12.44 a day for that year involving Ms. Venneris. We would find out very simply what it was for all of the class members, multiply that by what they call the car days. This is a very simple case if it's certified to calculate the total damages. And they agreed to that amount, and the judge, in his final ruling, made a factual finding of what the damages are in this case. And we believe that finding— we believe Ms. Venneris stands and not only shares common issues with these class members, her case is identical, and to borrow the term, this is a quintessential case for class certification. Not only do we have a business practice or scheme which they've admitted to and which has been exposed in this case, we have a uniform contract without any question that every single class member signed. We've got these contracts. They make a big deal about the rental jacket and say they put in different rental jackets that show different things. I haven't checked that part of the record. In the rental jacket, the only place the insurance, the ACE insurance is referenced? Yes. Okay. So the rental cover jacket is the only place where they show that you're buying that, correct? Yes. Okay. It's not in the rental contract? Yes, the rental jacket is part of the contract. I know, but the cover of the jacket is where they say you checked a box, you have it or something. Yes, that's the rental document signed by each individual insurer, signed it. They accepted the coverage. Yeah, but they say that there are—I don't know if this is right or not. I'm just asking you to respond to what they say, that the rental jackets are all different, and whether that's checked or not or what have you. What do you say about that? What they're saying, Your Honor, is not that the rental jacket is not different. We are saying the rental jacket is the same for everyone. Okay. The rental jacket says what the contract is. It's the rental contract signed by the individual renter, the rental brochure which you're given when you rent a car, they give you the brochure, and the rental receipt when it's returned. Just make sure I understand. I understand that your position basically is that the rental receipt and the rental jacket, in accordance with the merger clause that is in it, that's the contract. Yes. Their position is, no, no, no, no, no. The voucher, the rental receipt, and the rental jacket, that's the contract. I think that's what Judge Hall was referring to. It's the voucher. I thought your argument was that, yes, there are some differences, but they're not material because you want a class of people who check the ASI thing, right? Yes, that's the class. And that the differences you say, the other differences are immaterial. I thought that's what you were saying. Yes. Some of the rates of a child seat, for example, or a GPS, those people are not in this class. This class is people who accepted this coverage, paid for it, and were not given it. We know them by name. We know everything about them. What in the voucher did the district court rely on in your client's individual claim? That the insurance was paid for. But the voucher terms, Your Honor, the voucher when, for example, Ms. Veneris rented the vehicle in Scotland online and then printed out the voucher. It's a receipt that says what you're getting. Their testimony from the defendants, and this has to be because otherwise they couldn't keep track of their business. When the renters bring that voucher to the rental counter, all of that information is put right on the rental document. And we have it all on the face of the rental document. The court did not have to look outside the four corners of this document. It has a rate code which incorporates the fact that this insurance was to be provided. So the vouchers, number one, should not have been considered. It violates the parole evidence rule. Number two, even if they are considered, we know, as they have admitted, that every single thing on that voucher is inputted into their system and they discard the vouchers. So if the question is can they track who is in this class, absolutely. We know everything about these renters. Did they sign a uniform contract? Absolutely. The court's ruling violated the parole evidence rule. And the court made a clearly erroneous finding of fact because the vouchers cannot alter that rental agreement because their terms are incorporated into the rental document. This is a classic case for class action treatment. And we would ask that the court reverse for certification. The court did certify a case, and we gave notice to all of the foreign agents. Judge Black, you're over your time, and she has some questions. Just one question. Following up on Judge Rustani's very first question regarding the deductive claim, my reading of the district court order is the district court found that your client could not bring a cause of action for unauthorized insurance inside of the Bortel case, and that's what's before us, whether your client can bring it or not. Am I with you? Yes, absolutely. You with me? Absolutely. He found it was preempted by another statute, and that would eradicate the deductive. Thank you for answering my question. I'm going to reserve the rest of the time for my co-counsel. You'll have your full time. But what, because I've gotten a little confused on what documents are what, so I have her what I call the various documents. I'm not sure which one's the jacket, which one's . . . Can I hand these to the courtroom deputy, please? Before we hear the rebuttal, can you all just look at these and say, this is what you call the jacket, this is what you call the voucher? I'm just confused. I appreciate the indulgence of my colleagues. I am just dead. You're not confused. I'm not confused. Okay. Never have. Well, I just want them to confirm that I have it right. How about that? Is that better? And is there another document on her I should have? Just right on the top, what you all talk about in your briefs. What is a voucher? What is a jacket? What is the . . . Rental receipt. Which one's a rental receipt? What else do I need them to mark? Three. Jacket. Write it on the document. Okay, yeah, okay. But you all both need to agree. This is the rental jacket. Okay. Then is there . . . And the rental receipt. But both sides need to agree. Yeah, okay. I got a jacket and a receipt. And then what else? And the voucher. Oh, so I had the voucher, too. Good. I just didn't know what's what. I know, but it's just confusing. I get this. If I look at it, I can tell what's going on. Okay, got it. What you're fighting about. What you're fighting about. Okay. Hallelujah. I got the right documents then. Okay. Or rather my clerk got the right documents. Okay. Unless there's any other questions, I'll . . . No, you have your full time, sir. Thank you. May it please the court, my name is Bob Wright. I'm with Stork & Stork & Levan representing the defendants and appellees here, Avis Budget Car Rental System and Budget Rent-A-Car System Inc. I had a couple of procedural issues I was going to discuss, and I will if I have time at the end. But why don't I dive right into what you all are, I think, asking about the meat and potatoes of this argument. Although let me first . . . There was a mention about what I've been calling the cumulative or preemptive issue. Let me just touch on that very briefly. The judge said, arguably said in page 8 of his order, that statutory claims cannot be used to circumvent a private right of action. That may well be error in certain circumstances, but not thus. Hypothetically, I suppose it would be possible to have a . . . I'm looking at page 8. I'm sorry? I'm looking at page 8 of the order. Yes, ma'am. In the second paragraph? Because the first paragraph states that there's no standing and gives the classic definition of standing. The judge is wrong on that, correct? Your Honor, certainly there could be hypothetical situations where he would be wrong on that. He's not wrong on that in this situation because . . . So doesn't she have a claim? I'm sorry? Are you saying that there's no Article III standing in this case? No, Your Honor. What I'm saying is that based on the judge's findings here . . . I'm just talking about the first paragraph is talking about Article III standing. The first paragraph on page 8 . . . Right, Your Honor. . . . is talking about Article III standing. Is it your position that the plaintiff has no Article III standing? No, we do not say that. But what we do say is that in that ruling, when he said that, in the factual circumstances here that he has found, it would be impossible for her to have an actual fiducta award because nobody is acting as an insurer here. That would be based on the 624.155 statute. You're the one who explained to me in your brief that the fiducta claim covers both the breach of contract theory and the insurance theory. I think I got that idea. Your brief. The fiducta claim is like a two-part fiducta claim. Well, I will . . . Is that wrong? I don't know that we put that in our brief, Your Honor. We can . . . No, Your Honor. What we think the judge did was he may have conflated standing with commonality. Now, when you get to commonality, Your Honor, that's the reason that you are . . . He conflated something. I think maybe commonality, maybe predominance, maybe ability to represent the class. Do we really know what the judge did? Yes, I think we do, Your Honor, because the judge several times talked about commonality in his opinion. Other parts of the opinion. I'm sorry? Other parts of the opinion. Your Honor, I think it's implicit in the opinion, right from the findings of fact that he made about the different contracts that would have to be looked at here to establish a class. Remember, he found that the only way . . . Looking at the three documents that you all have in front of you, the rental receipt, the rental jacket, and the rental voucher, the plaintiff appellants are trying really hard to tell you you don't have to look at the voucher, that his looking at the voucher was wrong. They're saying it was unnecessary, extraneous, whatever. Well, the vouchers had to be considered by the judge, and he did consider when he awarded her her damages. They're in a catch-22 here. They're saying don't look at the vouchers. The vouchers aren't part of the transaction, even though they're specifically referred to in the other documents, and even though they supplied two key elements of her contract claim. In the rental jacket and in the rental receipt, there is reference to either $1 million or $2 million worth of coverage. The only way you know that she had $1 million worth of coverage would be to look at the voucher. The voucher is what supplies that. Additionally, the judge looked at the voucher because he noted that in the rental receipt, it said she paid nothing for SLI coverage. The plaintiff's position is all the information that is needed is in the Budget Avis records in this case, that the records show the amount each renter paid. Well, that's kind of interesting, Your Honor, because I understand that's their position. Actually, to be even a little more precise, what they're saying is that we responded to their discovery requests and produced a spreadsheet for them, which gave them every member of their alleged class. Well, that's not correct, Your Honor, and we argue in the brief. We point out that they asked for that information, certainly, and as we're permitted to do under the discovery rules, we gave them documents from which the class could be determined, and we did that, and there's affidavits in the record, affidavits of Ted Kushner, affidavits supported by an additional affidavit of Craig Rappel, and what Kushner said is, I'm the guy that produced the discovery. I produced the spreadsheet, and we, in our answer, said, as we're allowed to do, we said, we are producing the documents from which the class can be determined. But because of the files, the way the information is kept, Avis Budget just gave them a list of all of the people who traveled on travel vouchers, once again, vouchers, which they say aren't important, within the class period, and did not give them, and that had what's called an S-8, they further restricted. Counselor, you're going to have to be simpler with me. Okay, well, I'm sorry, Your Honor. No, no. That's a little complicated. My question was, their position is the record showed the amount each renter paid, and if you could just tell me in one sentence, you're saying the records didn't show that? No, Your Honor. What we produced for them was a spreadsheet of a list of names of people that traveled within the time period under an S-8 rate code. Now, they said, okay, that's it. Well, they didn't drill down into those names because, and we've produced, and it's in the record, an affidavit of a gentleman named Craig Rappel. He contacted Affordable Car Rental, which is one of the hundreds of brokers that Avis Budget deals with, and all of those brokers have their own form vouchers. That's why the judge was so concerned with commonality, so concerned with what did each of the renters think they were getting, and the only way Veneris could determine, the only way she could prove that she had $1 million in coverage was to look at her voucher, and the only way that he could determine. Why couldn't she determine that by looking at the rental jacket, which refers to $1 million? No, Your Honor. It says $1 or $2 million, depending on the circumstance, depending on location. Why couldn't she look at the rental jacket and know she had at least $1 million? She did know she had at least $1 million. From the rental jacket? From the rental jacket, but I suspect, Your Honor, if there had been a dispute on that rental jacket and a lawsuit, the question would have been, is it $1 or $2 million? It would have been $1 million to fight for. What was the term? That was the crucial term. What was the amount of coverage? That's a crucial determination. What does E-D-A-R mean? S-8 on the voucher. Well, the S-8 is a rate code. We know that, but what does E-D-A-R stand for? There's a cross from, is that a region? I believe that's the European region, Your Honor. Okay, European. I think there was testimony in the depositions that they divided up the world. I want to go back. It's page 11 of your brief. You explained to me that the FIDAPTA claim, the first part of it, the first theory is FIDAPTA based on contract. The second theory is FIDAPTA based on the breach of the insurance law. That's what you told me. You're the appellee, right? You filed the response brief. I'm sorry, Your Honor. You said that's page 11? If the district judge says that the insurance-based claim is superseded, controls, preempts, whatever, and you can't have a FIDAPTA claim because it would make the insurance remedy superfluous or whatever, he's still got a FIDAPTA claim, or she does, based on contract. That's what you told me. Page 11 of your brief. The first theory, which includes claims to breach of contract, count one, and a violation of FIDAPTA, a portion of count four, is based on the allegation that David's budget promised to provide Veneris with a separate SLI policy, but breached that promise because it failed to do so. So I'm saying whatever the judge may have said, whether it's right or wrong, about preemption in the insurance violation contract doesn't apply to that first use of FIDAPTA. Am I wrong? I think that is an argument that has been waived, Your Honor. It's been waived. I'm not sure that it's been presented in the particular argument that you're making right now. I'm not making an argument. I'm just reading your brief. Your Honor, it was never presented in the initial brief. We certainly didn't want to make that argument in response. Which is why I apologize for being caught a little flat-footed. Okay. Maybe led astray by your brief. I'm getting low on time here, but I believe there was a discussion about the merger issue, and apparently it's undisputed. They don't really argue that the Vega case, which is this Court's decision that says class actions are inappropriate where you have contracts with differing terms, and they realize that because of all these hundreds of other vouchers, form vouchers, that they're going to have a real problem with that if the voucher is part of the contract term. Well, so they are telling you that, okay, the voucher is not important, it's not part of the deal, et cetera. Well, Your Honor, if you look at their pleadings, their pleadings are rife with references to the voucher. We give you a whole list of sites there where they've put it in all of their pleadings the reference to it over and over again. And the reason is they're in a catch-22, as I think I started to say. Well, the voucher does say rental includes SLI up to $1 million. That's why they started out putting that in there. Or ALI for in, including SLI up to $1 million. But isn't that what the rate code means, S-8? What does the rate code mean? You just led me into a very important point that I wanted to make. What does S-8 mean? S-8 is a rate code. There was testimony that there are literally hundreds of rate codes, but the S-8 rate code does have certain inclusions and exclusions. But the interesting thing is. But is one of the inclusions an SLI? Well, that's the question, Your Honor, and the answer is no. They say absolutely yes, and that when we produced that spreadsheet, that that answered the question. But the affidavit of Craig Rappel, which is in the record, he went back and he contacted Affordable Car Hire, which is the broker that Ms. Veneris dealt with, and Affordable Car Hire gave him five vouchers for members of the purported class that are listed on the spreadsheet, and those vouchers are attached to Mr. Rappel's affidavit, which is part of the record here, and they do not specifically mention they don't resolve the $1 million, $2 million issue, what the coverage amounts are, and they certainly don't. They are not what the plaintiffs represent them to be. They destroy commonality when they are considered. If these people are, in fact, members of the class, there is no commonality because there is no reference in there that solves those two issues about how much coverage they're going to get. I'm going to harp back on my issue. I just found in their brief before this court where they claimed the DUPFA in connection with their contract claim. Are you saying they waived it because they didn't make it before the district judge? They certainly haven't made any arguments. In their opening brief. I'm looking at it. Oh, in their opening brief. I'm sorry, Your Honor. All right. So they didn't waive it before us, so are you saying they waived it below? That's what I'm asking you because you just said they waived it. Well, then I may have misspoken, Your Honor. I'm sorry. We haven't focused on that. All right. Thank you. I'm out of time. We believe that the decision below is true and correct and stems directly from the findings of fact that the court made, and as a result, that should be affirmed. Thank you. Mr. Norman, you're going to do the rebuttal? Yes, Your Honor. Please, the court. What I'd like to do on the rebuttal is I would like to explain how this system works. So Avis rents vehicles all over the world, and they do so with a system called a rate code. And a rate code says if you buy this code, I'm going to give you this car, and it's going to have certain inclusions. It might have SLI, the insurance. It might include a baby seat. It might include GPS. It might include additional driver. And those rate codes are how Avis identifies what they've sold to the renter through these brokers. So the voucher is just a receipt that the renter – Let me ask you this. Assume we look at the voucher along with the other documents. Is the result different? What other documents? The rental receipt and the rental jacket. Let's assume we look at all three together, okay? So just assume that hypothetically. Is there still commonality or not? Yes. And tell me why. Well, the voucher includes what the rental receipt says, which is the rate code. Both of those things say with this rental you get additional liability insurance. And the Avis records document that based on that code. So you don't need the voucher to prove that because the voucher is just a receipt showing you that this rental is for an S.A. code. And when they bring the voucher in – Let me get you to go back. Include the voucher as part of the contract. That's what I got when I go sign. Just assume. We've got to look at it. Yes. And so when we look at the breach of contract claim, we look at that because it has rental includes. Right. That's what you anticipate when you come sign the contract, okay? Assume it's part of it, okay? Why is there still no problem as to commonality? I mean, this says vouchers from U.S. rent car. Are there any other vouchers in the record? Apparently there are four or five others in the record. Yeah. So the voucher is a receipt that U.S. rent a car gives. Right. And it's a contract between only the – Your agent. It's your agent. They're your agent. The agent of the renter? They're a broker hired by Avis budget. Yeah. They're an agent of budget. The contract between them says they're not an agent. They're brokers. Okay. But that probably isn't material. All right. The fact of the matter is they just contracted these people to sell rentals at certain rate codes, and those rate codes apply certain inclusions, such as insurance. Do the other vouchers in the record from – I don't know if they're other brokers or what. Do they have this language, rental includes ALI including SLI up to $1 million? They do. I know they have the rate code. The rate code is how they do it. I'm going to look at them. You need to tell me. Yeah, yeah. The other brokers, the other vouchers that they have with the S8 rate code say, the terms and conditions of this can be found at this link. You pop up that link, which is in the record, and it says Avis budget applies $1 million of insurance with this rental. Okay, but they don't have this form here, rental includes, as clear. Not as clear. Okay. Not as clear, yeah. Maybe this could help identify things, Your Honor. So the Avis records, if you look at DE-233-1, there is something called the rate code sheet. And on this rate code sheet, it identifies every rate code, and there are a lot of them, and whether or not they have the ALI insurance. And the testimony in this case is crystal clear. The ALI insurance is always $1 million for the foreign renters, always. So all the Avis has to do is look at the rate code, and they know exactly if it includes the insurance or not. And as for the claim opposing counsel made, that the S8 rate code doesn't show additional liability insurance, so here's the rate code sheet showing all the rate codes. Then you drill down. There's a whole information sheet for each rate code, and this would be DE-92-5, Exhibit 2. This information sheet shows terms and conditions. And for S8, for instance, it absolutely says rates are composed of the following components, including additional liability insurance. It says it twice, additional liability insurance. So it is absolutely in all their records. That's how they know it. Otherwise, it would be absurd because they're saying, we throw away the vouchers. That's why there's no ascertainability. How large do you estimate this potential class is? I have no idea. I can tell you that, Your Honor, we actually have in the record 200,000 renters. 200,000. Yes, and we've actually given them notice. But if I could just show one other thing to you, is in this discovery that they produced, we sent them interrogatories, provide us a list of everybody who got a million dollars in this. At that time, they were saying the fake coverage, the self-insured coverage, the contractual coverage. And they gave us a list of 200,000 people. And on that list, and I can show you this. This is in the record. It's at Exhibit 233 on page 2, and there's an excerpt of it in the reply brief on page 24. This shows everything about every renter, the rental agreement number, the reservation number, the rate code, their credit card number, their date of birth, how much they paid in the voucher, how much they owed after they returned the car. Say they were a day late and they owed more money. It shows, actually, the voucher amount. So when they say you need to look at the voucher or you need to look at something like that to find out what they paid, it's in Avis's records in this spreadsheet. And may I give you a copy of that to look at it? I have them here. No, we wrote it down, 232, page 2. 233, page 2, is what describes this, and it describes the discovery. And discovery is responsive to a request. Give us the names, you know, all the renters who had this million dollars SLI. And the introductory even says million dollars, and that's where they give us the names. We have 200,000 of these people. We gave notice to 200,000 of these people, and it shows everything we need for the contract that's all in there. So not only is this class ascertainable, the class is ascertained. It's already done. There's nothing more to find out. And for instance, we also took a deposition of their people, and we got something called a blue monetary screen, which is DE-143-18, DE-143-18, Exhibit 11. This screen, which, again, is in Avis Budgets records, that they get when they input all the voucher data into the rental at the time of the rental agreement, shows what she paid. I can tell you how much gas she had when she returned the car. That's how much we know about every one of these. So where did the district court err? The district court erred in assuming that or forgetting that when the vouchers come in with the rate code and the rate terms, it's all subsumed into the rental agreement. For some reason, he thinks that a Fortune 500 company audited by Deloitte throws away the rental record of the voucher and has no idea what they've sold with the rental, when in fact they know every piece of paper from it. And part of the reason why, Your Honor, is because these affidavits that the defense counsel referred to, those were affidavits filed after the disclosure of discovery, and in the record we show those are sham affidavits because they contradict the testimony of those exact same witnesses. They had a paralegal, right, like a... Or did the district court strike the affidavits or consider them? It's not clear from the record. It's not clear from the record. It's either there's an order striking them or there is no order striking them. There is no order striking them. The district court considered them. And did he make fact findings based on those? Is that what they did? You asked me what his error was, Your Honor. I don't know how he came to his error. I don't know because the record is clear that the people who are known . . . But you're the appellant. You have to tell us how the district court erred. Okay. The district court erred in finding that the voucher terms were not incorporated into the rental agreement and the district court erred in finding that without the voucher, we don't know what the rental was, what the rental terms were, or what was paid. And all of that is in the records and more. And all of that has been provided in discovery to us. And else, Your Honor, if I add one other thing, they said we didn't have the names, but when we sent out the notice . . . I think you're over your time. Yeah. We don't have any more questions. I have to be fair. You're over your time. Okay. Thank you. Thank you, Mr. Norman. Thank you, Your Honor. Thank you, Your Honor. I have five seconds. Seriously. We . . . I don't know about five seconds, but then he's got to reply to what you say and he's got the burden. Okay. I mean, we're going to go through the record. Uh-huh. I mean, it's just . . . Okay. I'm just going to cite those two affidavits. Well . . . Appellant . . . We made note. We understand there were affidavits. He's just conceded they weren't admitted and you said Craig's . . . I've got the name written down. We . . . This is obviously a complex case and we'll have to scale the record and read everything. Thank you, Your Honor.  The next case of the morning . . .